# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **JERRY A. LESTER,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05cv00113 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| Commissioner of Social Security, | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

Plaintiff, Jerry A. Lester, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

-1-

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lester protectively filed his application for DIB on or about August 8, 2003, alleging disability as of August 1, 2003, based on gastritis, degenerative disc disease, bilateral carpel tunnel syndrome, osteoarthritis, posterior spurs, hyperlipidemia, kidney stones, depression and anxiety. (Record, ("R"), at 89-93, 99, 126.) The claim was denied initially and upon reconsideration. (R. at 67-69, 72-75.) Lester then requested a hearing before an administrative law judge, ("ALJ"). (R. at 76.) The ALJ held a hearing on May 23, 2005, at which Lester was represented by counsel. (R. at 26-61.)

By decision dated July 26, 2005, the ALJ denied Lester's claim. (R. at 14-24.) The ALJ found that Lester met the disability insured status requirements of the Act for disability purposes through the date of the ALJ's decision. (R. at 23.) The ALJ found that Lester had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 23.) The ALJ found that the medical evidence indicated that Lester suffered from severe impairments, namely degenerative disc disease and carpal tunnel syndrome, but he found that Lester did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) The ALJ also

found that Lester's allegations regarding his limitations were not totally credible. (R. at 23.) The ALJ found that Lester retained the residual functional capacity to lift and carry items weighing up to six pounds occasionally and up to three pounds frequently, to stand/walk for a total of four hours and to sit for a total of four hours in an eight-hour workday, but for never more than one hour to an hour and a half in either position. (R. at 24.) The ALJ found that Lester could occasionally kneel and crouch, but should never climb, stoop or crawl and should avoid constant use of his hands for reaching, handling, feeling, pushing and pulling. (R. at 24.) He further found that Lester had a sensorineural hearing loss in high frequencies and limitations for working around heights, moving machinery, temperature extremes, noise, humidity and vibration.[1] (R. at 21, 24.) Therefore, the ALJ found that Lester was unable to perform any of his past relevant work. (R. at 24.) Based on Lester's age, education and work experience, and the testimony of a vocational expert, the ALJ concluded that Lester could perform jobs existing in significant numbers in the national economy, including those of a cashier, a security guard and a meter reader. (R. at 24.) Thus, the ALJ found that Lester was not disabled under the Act and was not eligible for DIB benefits. (R. at 24.) *See* 20 C.F.R. § 404.1520(g) (2006).

After the ALJ issued his decision, Lester pursued his administrative appeals. (R. at 10.) The Appeals Council denied his request for review. (R. at 6-9.) Lester then filed this action seeking review of the ALJ's unfavorable decision, which now

---

[1] Regardless of this detailed residual functional capacity, the ALJ further found that Lester had the residual functional capacity to perform a "significant range of light work." (R. at 24.) Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2006).

-3-

stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2006). This case is before the court on Lester's motion for summary judgment filed on May 1, 2006, and on the Commissioner's motion for summary judgment filed on July 3, 2006.

## *II. Facts*

Lester was born in 1956, (R. at 89), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. § 404.1563(c). Lester has a ninth-grade education and past work experience as a coal miner and an electrician. (R. at 100, 105.)

Lester testified at his hearing that he experienced back and neck pain after sitting for prolonged periods of time. (R. at 33.) He stated that he took Tylenol for pain. (R. at 35.) Lester testified that he took Klonopin for anxiety, but that he still felt anxious. (R. at 35.) Lester also testified that he could stand for about an hour without interruption, walk about a quarter of a mile and sit for about three-quarters of an hour without interruption. (R. at 36-37.) Lester stated that he probably could work as a security guard if it did not require him to work around crowds. (R. at 38-39). He also testified that he had difficulty pushing and pulling objects due to extensive shoulder problems. (R. at 43). Lester testified that he struggled with anxiety and mood swings, as well as a lack of concentration and a loss of hearing. (R. at 45-47.)

John Newman, a vocational expert, also was present and testified at Lester's hearing. (R. at 47-52, 54-55, 57, 59.) When asked if there were any sedentary[2] or light jobs with skills transferable from that of an electrician, Newman testified that an electric meter reader would be one example. (R. at 49.) Newman was then asked if there were jobs that could be performed by an individual of Lester's age, education and work experience, who was limited to lifting items weighing up to six pounds, standing and/or sitting for up to four hours in an eight-hour day with never more than an hour to an hour and a half in either position, and who could not use his dominant upper extremity for repetitive or constant use. (R. at 50.) Newman testified that jobs existed that such an individual could perform, including jobs as a cashier and a security guard. (R. at 50-51.)

In rendering his decision, the ALJ reviewed records from Miner's Medical Clinic; Mountain Empire Neurological Associates, P.C.; Highland Neurosurgery, P.C.; Clinch Valley Medical Center; Abingdon Ear, Nose and Throat Associates, P.C.; The Clinic; Life Recovery; Dr. Ramon H. Motos, M.D.; Dr. Rolando M. Chavez, M.D.; Dr. Jim C. Brasfield, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; Dr. Frank Hancock, M.D.; Dr. Matthew W. Wood Jr., M.D.; Dr. Shawn K. Nelson, M.D.; Dr. David R. Robins, D.O.; Dr. Mark S. Clem, PA-C; Timothy M. Trent, P.T.; Dr. Marilou V. Inocalla, M.D., a psychiatrist; Dr. Roger D. Neal, M.D.; and Dr. Sharad Sawant, M.D.

---

[2]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2006).

Case 1:05-cv-00113-PMS   Document 17   Filed 11/16/06   Page 5 of 20   Pageid#: 93

The record shows that Lester was treated by Dr. Ramon A. Motos, M.D., from 1982 through 2005. (R. at 190-236, 276-362, 369-77.) On February 7, 2001, x-rays showed mild degenerative changes of the lumbar spine and right renal stones. (R. at 330.) On December 19, 2001, x-rays of Lester's cervical spine showed moderate degenerative disc disease at the C4-5 and C5-6 levels with probable encroachment on the neural foramina by posterior spurs. (R. at 302, 323.) On August 15, 2002, Lester complained of recurring pain and numbness in both hands, particularly on the left side. (R. at 320.) A CT scan of Lester's cervical spine was taken on August 19, 2002, revealing moderate spondylitic changes at the C4-5 and C5-6 levels as well as posterior spurs encroaching on the neural foramina, but no evidence of spinal canal stenosis or disc herniation. (R. at 300, 321.)

On January 6, 2003, Lester complained of back pain, which Dr. Motos opined was probably due to degenerative disc disease. (R. at 299.) Lester had tenderness, spasm and a limited range of motion in his back. (R. at 299.) On July 21, 2003, x-rays of Lester's right shoulder and elbow were normal. (R. at 314.) On August 4, 2003, a CT scan of Lester's cervical spine revealed no significant changes since the August 2002 CT scan. (R. at 308, 312.)

On August 18, 2003, Dr. Motos noted tenderness and limited range of motion in Lester's paraspinal neck region, as well as diffuse tenderness and limited range of motion of the back. (R. at 298.) On October 6, 2003, Dr. Motos noted limited range of motion of Lester's neck, as well as reiterating his diagnosis of degenerative disc disease and hyperlipidemia. (R. at 297.)

-6-

Case 1:05-cv-00113-PMS   Document 17   Filed 11/16/06   Page 6 of 20   Pageid#: 94

On March 5, 2004, Dr. Motos completed a physical assessment in which he opined that Lester could lift and/or carry items weighing up to 10 pounds occasionally and up to five pounds frequently, stand and/or walk four hours in an eight-hour workday and sit up to two hours in an eight-hour workday. (R. at 265-67.) Dr. Motos also opined that Lester could frequently balance, occasionally climb, stoop, kneel and crouch, but never crawl. (R. at 266.) Dr. Motos also opined that Lester was limited in his ability to reach, to handle, to feel, to push and to pull. (R. at 266.) Dr. Motos also opined that Lester should avoid working around heights, moving machinery, temperature extremes, humidity and vibration. (R. at 267.)

On March 5, 2004, Dr. Motos also completed a mental assessment, indicating that Lester had no useful ability to deal with work stresses or to understand, remember and carry out complex job instructions. (R. at 262-64.) Dr. Motos opined that Lester had a seriously limited, but not precluded, ability to deal with the public, to interact with supervisors, to maintain attention and concentration and to understand, remember and carry out detailed and simple job instructions. (R. at 262-63.) Dr. Motos also opined that Lester had a limited but satisfactory ability to follow work rules, to relate to co-workers, to function independently and to make personal and social adjustments. (R. at 262-63.)

On August 19, 2004, Lester complained of neck and shoulder pain. (R. at 276.) Lester had a limited range of motion of the neck and slight tenderness extending to the right shoulder. (R. at 276.) No muscle atrophy was noted. (R. at 276.) Dr. Motos diagnosed Lester with chronic pain due to degenerative disc disease of the cervical spine, hyperlipidemia and anxiety. (R. at 276.) On October

22, 2004, Lester complained of left elbow and neck pain. (R. at 374.) Dr. Motos reiterated his diagnosis of degenerative disc disease of the cervical and lumbosacral spine and also diagnosed epicondylitis of the left elbow. (R. at 374.)

On May 3, 2005, Dr. Motos completed another physical assessment, indicating that Lester could lift and/or carry items weighing up to three pounds frequently and six pounds occasionally and could stand, walk and/or sit for a total of up to four hours in an eight-hour workday, but for only one to one and a half hours without interruption. (R. at 381-83.) Dr. Motos opined that Lester could frequently balance, occasionally kneel and crouch and never climb, stoop or crawl. (R. at 382.) Dr. Motos also opined that Lester's abilities to reach, to handle, to feel, to push, to pull and to hear were affected by his impairments. (R. at 382.) He opined that Lester should avoid working around heights, moving machinery, temperature extremes, noise, humidity and vibration. (R. at 382-83.) Dr. Motos based these findings on Lester's diagnoses of degenerative disc disease of the cervical and lumbosacral spine, right shoulder impingement syndrome, carpal tunnel syndrome, osteoarthritis and hearing loss. (R. at 381-83.)

On May 3, 2005, Dr. Motos also completed a mental assessment, indicating that Lester had a limited but satisfactory ability to follow work rules, to relate to co-workers, to interact with supervisors, to function independently, to maintain personal appearance, to behave in an emotionally stable manner and to demonstrate reliability. (R. at 378-80.) Dr. Motos indicated that Lester was seriously limited, but not precluded, in his ability to deal with the public, to maintain attention and concentration, to understand, remember and carry out simple job instructions and to relate predictably in social situations. (R. at 378-79.) Dr. Motos opined that

Lester had no useful ability to deal with work stresses and to understand, remember and carry out complex and detailed instructions. (R. at 378-79.)

On September 30, 2002, Dr. Jim Brasfield, M.D., examined Lester for his complaints of neck pain. (R. at 237-38.) Lester reported severe pain in his neck after working 90 to 100 hours per week. (R. at 237-38.) Lester stated that the pain lessened when he worked normal hours. (R. at 237-38.) Dr. Brasfield noted no radicular pain or myelopathy, but did note bilateral numbness in Lester's hands. (R. at 237.) Dr. Brasfield noted that Lester had a good range of motion and good strength in his arms. (R. at 237.) Dr. Brasfield diagnosed Lester with moderate to severe cervical degenerative disc disease and bilateral carpal tunnel syndrome. (R. at 237.) Dr. Brasfield recommended conservative treatment, including wrist extensor braces, and opined that Lester could continue his regular work activity. (R. at 238.)

On September 17, 2003, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a physical residual functional capacity assessment, indicating that Lester could perform light work. (R. at 251-58.) Dr. Surrusco noted no other limitations. (R. at 254-58.) This assessment was affirmed by Dr. Donald R. Williams, M.D., another state agency physician. (R. at 258.)

On December 10, 2003, Lester saw Dr. Matthew W. Wood Jr, M.D., for complaints of lower back pain, cervical pain and right shoulder pain. (R. at 249.) Lester had no focal weakness or atrophy in either upper extremity. (R. at 249.) He had a full range of motion in his neck. (R. at 249.) An MRI of Lester's cervical spine, performed on December 15, 2003, showed degenerative disc change at

multiple levels and foraminal narrowing. (R. at 246-48.) On December 29, 2003, Dr. Wood noted no significant compression lesions, but did note mild limitation of range of motion in Lester's right shoulder. (R. at 245.) Dr. Wood stated that he could not recommend surgery for Lester's neck. (R. at 245.)

On December 15, 2003, Dr. Shawn K. Nelson, M.D., performed a nerve conduction study and electromyogram. (R. at 240-44.) Dr. Nelson noted that Lester had intact arm and hand strength, and had no Tinel's sign or focal atrophy. (R. at 240.) Dr. Nelson diagnosed Lester with chronic neck and shoulder pain, as well as bilateral carpal tunnel syndrome. (R. at 240-41.) Dr. Nelson recommended that Lester wear wrist splints for at least four to six weeks. (R. at 241.)

On January 9, 2004, Lester was seen by Dr. David R. Robins, D.O., an orthopedic surgeon, for his complaints of neck and right shoulder pain and carpal tunnel syndrome. (R. at 287-88.) Dr. Robins noted a limited range of motion in Lester's right shoulder and normal strength in his upper extremities and right hand. (R. at 288.) X-rays of Lester's right shoulder were normal. (R. at 289.) Dr. Robins diagnosed Lester with shoulder impingement syndrome, carpal tunnel syndrome and neck pain. (R. at 288.) On February 9, 2004, Lester reported that his shoulder was doing much better, but he continued to complain of numbness in his hand. (R. at 286.) Dr. Robins referred Lester for physical therapy. (R. at 286.) On March 30, 2004, Dr. Robins performed right carpal tunnel release. (R. at 268-70.) On April 13, 2004, Lester reported that he was doing very well, that the numbness had become only mildly sporadic and that he had sensation back in his fingers. (R. at 271.) On June 9, 2004, Lester reported only occasional numbness, and he reported that he was doing very well. (R. at 272.) Lester reported

-10-

tremendous increase in function. (R. at 272.) On March 19, 2004, an MRI of Lester's right shoulder showed chronic tendonopathy of the rotator cuff, a prominent bone cyst and some acromioclavicular joint arthrosis. (R. at 272.) Lester was diagnosed with right shoulder impingement syndrome. (R. at 272.) Dr. Robins recommended surgery, but Lester refused. (R. at 272.)

From March 18, 2004, through December 3, 2004, Lester was seen by Dr. Sharad Sawant, M.D., and Dr. Marilou V. Inocalla, M.D., of Life Recovery for his complaints of depression. (R. at 384-89.) On March 18, 2004, Dr. Sawant reported that Lester showed symptoms of depression and anxiety. (R. at 388.) Lester reported that his stressors included chronic pain and financial problems. (R. at 389.) Lester reported no prior mental health treatment. (R. at 389.) Lester was described as alert, stable and reactive with clear and coherent speech. (R. at 388.) Lester's Global Assessment of Functioning, ("GAF"), score was assessed at 55.[3] (R. at 388.) Dr. Sawant diagnosed recurrent, moderate major depressive disorder and Wellbutrin was prescribed. (R. at 388.) On December 3, 2004, Dr. Inocalla noted that Lester showed signs of self-isolation and depression. (R. at 384.) Dr. Inocalla diagnosed Lester with recurrent, moderate major depressive disorder, and Cymbalta, Trazodone and Klonopin were prescribed.[4] (R. at 384.)

---

[3]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION*, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 51-60 indicates that an individual has "[m]oderate symptoms...OR moderate difficulty in social, occupational, or school functioning..." DSM-IV at 32.

[4]A review of Lester's pharmacy records shows that Lester did not fill any of the medications prescribed by the physicians at Life Recovery. (R. at 157-58.)

On May 14, 2004, Lester reported that he was "doing well," and reported a low level of energy. (R. at 386.) Dr. Sawant reiterated his opinion that Lester suffered from major depressive disorder, as well as anxiety. (R. at 386.) Dr. Sawant increased Lester's medications. (R. at 386.) On August 11, 2004, Lester stated that he was "less depressed." (R. at 385.) Dr. Sawant again diagnosed major depressive disorder. (R. at 385.)

On June 22, 2004, Dr. Roger D. Neal, M.D., conducted an audiometric test, which indicated that Lester had significant sensorineural hearing loss in the high frequencies. (R. at 367-68.) Dr. Neal opined that Lester was not having enough hearing trouble to warrant a hearing aid. (R. at 368.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated July 26, 2005, the ALJ denied Lester's claim. (R. at 14-24.) The ALJ found that the medical evidence indicated that Lester suffered from severe impairments, namely degenerative disc disease and carpal tunnel syndrome, but he found that Lester did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) The ALJ found that Lester retained the residual functional capacity to lift and carry items weighing up to six pounds occasionally and up to three pounds frequently, to stand/walk for a total of four hours and to sit for a total of four hours in an eight-hour workday, but for never more than one hour to an hour and a half in either position. (R. at 24.) The ALJ found that Lester could occasionally kneel and crouch, but should never climb, stoop or crawl and should avoid constant use of his hands for reaching, handling, feeling, pushing and pulling. (R. at 24.) He further found that Lester had a sensorineural hearing loss in high frequencies and limitations for working around heights, moving machinery, temperature extremes, noise, humidity and vibration. (R. at 24.) Therefore, the ALJ found that Lester was unable to perform any of his past relevant work. (R. at 24.) Based on Lester's age, education and work experience, and the testimony of a vocational expert, the ALJ concluded that Lester could perform jobs existing in

-13-

Case 1:05-cv-00113-PMS   Document 17   Filed 11/16/06   Page 13 of 20   Pageid#: 101

significant numbers in the national economy, including those of a cashier, a security guard and a meter reader. (R. at 24.) Thus, the ALJ found that Lester was not disabled under the Act and was not eligible for DIB benefits. (R. at 24.) *See* 20 C.F.R. § 404.1520(g) (2006).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

In his brief, Lester argues that the ALJ erred by finding that he had the residual functional capacity to perform light work. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 8-9.) Lester also argues that the ALJ erred in determining that a significant number of jobs existed in the national economy that he could perform. (Plaintiff's Brief at 9.) Lester further argues that the ALJ erred by finding that he did not suffer from a severe mental impairment. (Plaintiff's Brief at 10-11.) Finally, Lester argues that the ALJ erred by failing to find that his condition met or equaled the listed impairment for disorders of the spine found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. (Plaintiff's Brief at 12-15.)

Based on my review of the evidence, I find that substantial evidence exists in this record to support the ALJ's finding that Lester's condition did not meet or equal the impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.04(A) and (B). To meet § 1.04(A) and (B), a claimant must suffer from either a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis or vertebral fracture, resulting in compromise of a nerve root or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test or spinal arachnoiditis manifested by severe burning or painful dyesthesia, resulting in the need for changes in position or posture more than once every two hours. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A) and (B) (2006). Also, the regulations specifically state that the responsibility for determining whether a claimant's

condition meets or equals a listed impairment rests with the Commissioner. *See* 20 C.F.R. § 404.1527(e)(2) (2006).

A CT scan of Lester's cervical spine performed in August 2002 showed no evidence of spinal stenosis or disc herniation. (R. 300, 321.) In September 2002, Dr. Brasfield reported that Lester experienced no radicular pain, had no symptoms suggestive of myelopathy, had normal reflexes in his upper extremities, good range of motion in his arms and good arm strength. (R. at 237.) Dr. Brasfield opined that Lester could perform his regular work activity. (R. at 238.) In December 2003, Dr. Nelson reported that Lester had intact strength in his arms and hands, negative Tinel's sign, no focal atrophy and no evidence of significant radiculopathy in EMG testing. (R. 240.) In December 2003, Dr. Wood also reported no evidence of nerve root compression. (R. 245.) Lester had no focal weakness or atrophy in his upper extremities. (R. 249.) Lester had a full range of motion in his neck. (R. 249.) In January 2004, Dr. Robins found normal strength in Lester's upper extremities and no wasting. (R. 288.)

I also find that substantial evidence exists in the record to support the ALJ's finding that Lester's condition did not meet or equal § 1.04(C). Section 1.04(C) refers to lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness and resulting in inability to ambulate effectively. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.00(B)(2)(b), 1.04(C) (2006). There is no evidence in the record that Lester experienced chronic weakness and that this resulted in an inability to walk effectively.

Lester further argues that the ALJ erred by failing to find that he suffered from a severe mental impairment. (Plaintiff's Brief at 10-11.) The record shows that Dr. Motos first noted anxiety in August 2004 when he merely recorded Lester's complaints and prescribed Ambien. (R. at 276.) In March 2004 and May 2005, Dr. Motos completed two mental assessments, indicating that Lester had limitations in his ability to make occupational, performance and social adjustments. (R. at 262-64, 378-80.) The ALJ found that these assessments were not supported by Dr. Motos's treatment notes or the record as a whole. (R. at 19.)

The record shows that Lester began treatment with Life Recovery in March 2004. (R. at 384-89.) At that time, Lester was diagnosed with major depression and medications were prescribed. (R. at 388.) In May 2004, Lester reported that he was "doing well." (R. at 386.) In August 2004, Lester reported that he was "less depressed." (R. at 385.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Furthermore, there is no evidence that either Dr. Inocalla or Dr. Sawant placed any restrictions on Lester as a result of his mental impairment. Also, Lester reported that he was able to cook several meals a week, perform various household chores and yard work, hunt and fish, leave home three to four times a week without assistance, shop, read magazines, books and the Bible, as well as visit family and friends. (R. at 118-24.)

Lester also argues that the ALJ erred in determining his residual functional capacity. (Plaintiff's Brief at 8-9.) In particular, Lester argues that the ALJ made contradictory findings concerning his residual functional capacity. The ALJ found that Lester retained the residual functional capacity to lift and carry items weighing

up to six pounds occasionally and up to three pounds frequently, to stand/walk for a total of four hours and to sit for a total of four hours in an eight-hour workday, but never more than one hour to an hour and a half in either position. (R. at 24.) He also found that Lester could occasionally kneel and crouch, but should never climb, stoop or crawl and should avoid constant use of his hands for reaching, handling, feeling, pushing and pulling. (R. at 24.) He further found that Lester has a sensorineural hearing loss in high frequencies and limitations from working around heights, moving machinery, temperature extremes, noise, humidity and vibration. (R. at 24.) While the ALJ also found that Lester retained the residual functional capacity to perform light work, it appears that the ALJ relied upon the specific assessment identified above to determine Lester's actual residual functional capacity. (R. at 21, 24.) Based on my review of the record, I find that the ALJ's assessment is consistent with that of Dr. Motos. (R. at 381-83.) Furthermore, Dr. Motos's physical assessment was the basis for the ALJ's hypothetical question to the vocational expert, who found that a significant number of jobs existed that Lester could perform. (R. at 50-52.) Based on this, I find that substantial evidence exists to support the ALJ's finding with regard to Lester's residual functional capacity.

Finally, Lester argues that the jobs identified by the vocational expert did not constitute a "significant" number of jobs as required by the regulations. *See* 20 C.F.R. § 404.1566 (2006). (Plaintiff's Brief at 9.) In this case, the ALJ found that Lester was unable to perform the full range of light work, but that he was capable of making an adjustment to work which existed in significant numbers in the national economy. (R. at 24.) Thus, the issue before the court is whether the ALJ's decision on this point is supported by substantial evidence. I find that it is. In this

-18-

case, the vocational expert offered testimony with regard to specific jobs that Lester could perform. He addressed the availability of work within the regional and the national economy. The vocational expert stated that there would be approximately 1,800 cashier jobs in Virginia and 70,000 cashier jobs in the national economy that Lester could perform. (R. at 50-51.) The vocational expert testified that there would be approximately 2,000 security guard jobs in Virginia and 110,000 security guard jobs in the national economy. (R. at 51.) Lester argues that the number of jobs in the regional economy would not constitute a "significant" number of jobs as required by the regulations. The Court of Appeals for the Fourth Circuit, however, stated in *Hicks v. Califano*, 600 F.2d 1048,1051 n. 2 (4th Cir. 1979), that 110 jobs would not constitute an insignificant number. In *Craigie v. Bowen*, 835 F.2d 56, 58 (3rd Cir. 1987), the Third Circuit also stated that 200 jobs in the region was a clear indication that there existed in the national economy other substantial gainful work which a claimant could perform. In this case, the vocational expert identified 1,800 cashier jobs and 2,000 security guard jobs that existed in the regional economy that Lester could perform. Based on the above-stated cases, I find that these jobs would constitute a significant number.

*IV. Conclusion*

For the foregoing reasons, Lester's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED: This 16th day of November 2006.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE